UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES M. BAGENSTOSE, )
                      )
        Plaintiff     )
                      )
           v.         )   Case No. 1:06-cv-1245(JDB)
                      )
GOVERNMENT OF THE DISTRICT OF COLUMBIA, et al.,)
                      )
        Defendants    )
                      )
_____)

OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff opposes Defendant District of Columbia's Motion for Summary Judgment for the following reasons:

1. The issues before the Court in this case are as follows:

   a. Do the District of Columbia adjudicative bodies (i.e., the D. C. Office of Human Rights (OHR), the D. C. Office of Employee Appeals (OEA), and the D. C. courts) deliberately, knowingly, and maliciously thwart the civil rights laws of this country, Title VII in particular, in order to protect the Government of the District of Columbia from financial liability for its wrongdoings towards its employees?

   b. Do the District of Columbia adjudicative bodies seek to dissuade reasonable D. C. Government employees from making or supporting charges of discrimination by employing dishonest, deceptive, and devious devices to defeat their complaints, which a recent U. S. Supreme Court decision (<u>Burlington Northern and Santa Fe Railway Co. v. White</u>, No. 05-259) says is illegal retaliation?

RECEIVED
OCT 12 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

  c. Are the District of Columbia adjudicative bodies emboldened to commit egregious acts against D. C. Government employees, who have filed complaints, out of a desire to protect the D. C. Government, and because they believe that they are fully protected by the doctrine of res judicata and won't be held accountable.

  d. Does the U. S. Equal Employment Opportunity Commission (EEOC) have the right to refuse to accept or investigate a discrimination complaint against the OHR, because it could impair the working relationship between the two agencies?

2. The Defendant's Motion states that the Plaintiff's Title VII claim regarding his 1996 termination is barred by res judicata, because the D. C. Superior Court has already adjudicated the pertinent issues. However, a federal court is not necessarily bound by this doctrine, if a federal purpose and interest would be undermined by applying collateral estoppel. (See Attachment No. 1: <u>American Mannex Corporation v. Rozands</u>, 462 F.2d 688)

  The D. C. Superior Court and subsequently the D. C. Court of Appeals thwarted Title VII by ignoring all the precedent court decisions, which say that an employee must not be given false information when he retires and must be informed that if he retires, he cannot appeal his termination.

> (Examples include <u>Taylor v. United States</u>, 591 F.2d 688 which states that an action is voluntary [only] if the employee is free to choose [and] **understands the transaction** (emphasis added), <u>Covington v. Department of Health and Human Services</u>, 750 F.2d 937 which states that a decision made "with blinders on," **based on misinformation or lack of information,** cannot be binding as a matter of fundamental fairness and due process (emphasis added), <u>Gonzalez v. Department of Transportation</u>,

>701 F.2d 36 (5th Cir. 1983) which notes that the regulations furnished the petitioner did not show that a voluntary resignation waives the right to appeal the termination action of an agency-employer, and <u>Scharf v. Department of the Air Force</u>, 710 F.2d 1572 which states that the agency's inadequate counseling...misled the petitioner about his retirement rights.)

In addition, the D. C. Superior Court judge falsely accused the Plaintiff of retiring in order to avoid being RIFed, and the D. C. Court of Appeals rendered its decision with the full knowledge that a hoax had been perpetrated against the Plaintiff when he retired. (The District of Columbia Public Schools (DCPS) Personnel Office falsely told the Plaintiff that he had to submit his retirement papers or very likely suffer adverse consequences.) In this blatantly dishonest manner the D. C. courts thwarted Title VII, in which the federal government has a very strong interest.

The United States Constitution, moreover, does not require that federal courts accord full faith and credit to state-court judgments. (Wright, Miller & Cooper, <u>Federal Practice and Procedure: Jurisdiction</u> 2d #4469)

3. The Defendant's Motion states that the Plaintiff's Title VII claim with respect to his re-assignment from the School Without Walls to Jefferson Junior High School is barred, because it is a lateral transfer and, therefore, not an adverse action. A recent U. S. Supreme Court decision, however, says that an employment-related action can be considered adverse and, therefore, retaliatory if a reasonable employee would find the action in question to be materially adverse to the point that it could dissuade a reasonable worker from making or supporting a charge of discrimination.

3

(<u>Burlington Northern & Santa Fe Railway Co. v. White</u>, No. 05-259)
In the instant case the Plaintiff was transferred from a school in which the students were well behaved and striving to prepare themselves for college to a school in which the students were not well behaved and were far below grade level in the Plaintiff's subject field of mathematics. Most teachers would consider such a move to be grossly adverse.

4. The Defendant's Motion states that the Plaintiff's due process claim against the OHR is barred, because the District has immunity for quasi-judicial functions, and the Plaintiff has obtained all of the process that he is due. The Motion says that <u>Crew v. Barry</u>, 1979 U.S. Dist. LEXIS 9582 affirmed the proposition that the OHR performs a quasi-judicial function. Perhaps that decision was correct for that particular case, because it was a private sector matter. The OHR has a different complaint process for District Government employees. (See Attachment No. 2) Because the OHR is highly secretive about the process, the Plaintiff has filed a Freedom of Information Act request to try to find out specifically what the differences are.

In the instant case the OHR functioned as an administrative agency and acted in the interest of the D. C. Government. It protected the government through the use of deceptive and deceitful acts. It was anything but a neutral forum and could not possibly be considered judicial in any sense of the word. For example, the Plaintiff should have received a trial-type hearing under D. C. Code #2-1411.03(6) but received a limited hearing instead

in which he was not permitted to substantiate his case. Thus, the Plaintiff's claim against the OHR is subject to review by this court.

5. The discussions above clearly show that the Defendant's arguments for summary judgment are wholly without merit. It is shameful, moreover, that the Office of the Attorney General is spending tax dollars to defend the practice of mistreating D. C. Government employees, who file discrimination complaints.

6. Some of the deceitful practices the D. C. adjudicative bodies employ are as follows:

   a. In handling the complaints of D. C. Government employees, the OHR does not notify the perpetrator of the discriminatory and/or retaliatory acts that a complaint has been filed. Instead, a third party is notified. This allows the perpetrator to claim lack of knowledge of the complaint and, therefore, innocent of retaliation.

   b. When RIFing employees, the D. C. Government gives the affected employees instructions about the various courses of action which they can take. The instructions are so clear that a reasonable mind would have no cause to seek counseling about them. The instructions, however, deliberately leave out any mention of the fact that if an employee retires, he forfeits his right to appeal his termination. Then, if necessary, the employee is conned into retiring, thus unknowingly forfeiting his right to appeal his dismissal. While other courts of law have ruled against such deceptive practices, the D. C. courts have upheld them, thus permitting the D. C. Government to circumvent the civil rights laws of this country.

   c. After an employee files a complaint with the District of Columbia Public Schools (DCPS) Equal Employment Opportunity Office (EEO) and his supervisor has retaliated against him for it, he may file a complaint with the OHR charging retaliation for the DCPS EEO complaint. If the OHR concedes that retaliation has taken place, it attributes the retaliation to the OHR complaint rather than to the DCPS EEO complaint which it was asked to investigate. This maneuver breaks the connection between the DCPS EEO complaint and the retaliation and places an impossible burden on the employee to prove that the supervisor knew about the OHR complaint, because the OHR

5

      never told him/her about it as it should have done.

    d. Another device which the OHR employs to thwart the civil rights laws is the "limited" hearing, whereby a Complainant is not permitted to substantiate his complaint but must prove something the OHR has contrived, which it knows is impossible to prove.  In the instant case the Complainant was not allowed to substantiate that the retaliation began with the DCPS EEO complaint but had to prove that the retaliation occurred because of his complaint about the retaliation against the DCPS EEO complaint.  Although one D. C. Superior Court judge noted that the Complainant was entitled to a trial-type hearing, he nevertheless went along with the OHR's "limited" hearing.

    e. The officers of the D. C. adjudicative bodies, including the courts, routinely lie, distort evidence, misstate the testimonies of witnesses, and ignore the applicable case law, as they seek to protect the D. C. Government from financial liability for its wrongdoings.  An OHR Hearing Examiner, for example, stated in her report in the instant case that the Complainant attributed the retaliation he experienced to his OHR complaint.

    f. The D. C. adjudicative bodies, moreover, suppress whatever evidence a D. C. Government employee Complainant supplies to support his/her case.  For example, in the instant case the OHR wouldn't accept a signed statement by the Jefferson Junior High School principal that she hadn't followed the RIF procedures, because her supervisor hadn't signed off on it.  For another example, an OHR Hearing Examiner wouldn't allow the Complainant in the instant case to enter evidence that the School Without Walls principal lied when she testified that she didn't know about the DCPS EEO complaint and, therefore, could also have lied about not knowing about the OHR complaint.

7. The Supreme Court of the United States has ruled that an employer's actions, which are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination, are retaliatory.  (<u>Burlington Northern & Santa Fe Railway Co. v. White</u>, No. 05-259)  Certainly all of the above actions, which are just a sampling of all that occurred, meet that specification.

8. The Washington Post reported on page A2 of its October 3, 2006, edition that the U. S. Supreme Court rejected 1,900 appeals that piled up during the summer recess. This is another reason why the D. C. adjudicative bodies feel safe and secure in carrying out their egregious acts.

9. The Plaintiff in this case wants most of all to create a legal environment within the District of Columbia, whereby future D. C. Government employees who file discrimination complaints will not be treated as unfairly as he has been. To that end he hopes that the Court will order the D. C. Government to do the following things:

   a. Notify perpetrators of discriminatory and/or retaliatory acts directly rather than through intermediaries that a complaint has been filed.

   b. Notify terminated employees in writing that if they retire or resign, they cannot appeal their terminations.

   c. Make sure information given to terminated D. C. Government employees is truthful and accurate.

   d. Grant terminated D. C. Government employees, who file complaints with the OHR, court-like hearings as prescribed by law.

   e. Attribute its determination that retaliation has occurred to the complaint which it investigated and not to some other complaint.

   f. Refrain from distorting, falsifying, and misrepresenting the testimonies of witnesses and the evidence.

   g. Refrain from defaming Complainants.

   h. Refrain from arbitrarily excluding evidence or precedent court decisions that are relevant to the case, simply because they weaken the government's arguments.

   i. Refrain from reopening a case a second time, because the D. C. Government does not wish to respond to questions posed to it the first time.

    j. Refrain from closing a case before it has run its full course so as to be able to deny any connection between the original incident and the final outcome.

10. The Plaintiff prefers to hold his evidence for presentation at the trial. The Defendant, however, has presented some documents helpful to the Plaintiff, which require comment as follows:

> Exhibit A shows that the OHR reversed its Probable Cause finding that the Complainant was a victim of retaliation for filing his February, 1995, OHR complaint. This was a sleight of hand trick. The retaliation began with the Complainant's September, 1994, DCPS EEO complaint, which is what the February, 1995, OHR complaint was about. The OHR conducted a "limited" hearing in which the Complainant was forbidden to explain which complaint caused the retaliation.
>
> Exhibit B shows that the Plaintiff's OHR complaint cited the EEO complaint as the causative factor. (See particulars #3, first paragraph, and #4g) This proves that the OHR cited the wrong complaint as the cause of the retaliation.
>
> Exhibit C shows that the Specific Notice of Reduction-In-Force makes no mention that retirement forfeits a person's right to appeal his/her RIF. The D. C. courts ignored precedent decisions in other jurisdictions that say that an employer must inform a terminated employee of this fact. The precedent court cases also say that an employer is not supposed to give the employee false and misleading information. The Plaintiff was falsely told that he had to submit his retirement papers or possibly suffer a significant financial loss. The D. C. Court of Appeals was well aware of this hoax, but ignored it. How often does a court of law support the perpetrator of a hoax and blame the victim instead for being fooled? Swindlers: take notice!
>
> Exhibit D shows that the D. C. Court of Appeals totally ignored the precedent court cases described in the preceding paragraph and cited on pages 2 and 3 of this pleading. It also shows that the D. C. Court of Appeals rationalized its decision by saying that the Plaintiff should have sought counseling before retiring, if he was confused about the information presented. The truth is that the information was presented so clearly that no reasonable person would seek clarification, if he didn't know and wasn't told that retirement forfeits an employee's right to appeal his termination. At no time was the Plaintiff made aware that he was making a choice. The DCPS Personnel Office told the Plaintiff that he had to fill out his retirement papers; or it would be done for

8

him, whether he wants it done or not. The D. C. Court of Appeals upheld the perpetrator of a hoax rather than the victim of it.

Exhibit E contains so many falsehoods that the Plaintiff filed a complaint with the Director of the OEA. He asked the Director to compare the Initial Decision with the transcript of the hearing. The Director agreed to do that, but he failed to carry out his promise. Instead, the OEA issued an Opinion and Order on Petition for Review, which was predicated upon a new set of falsehoods.

Exhibit F shows that the OHR incorrectly attributed the retaliation which he suffered to his 1995 OHR complaint instead of to his 1994 DCPS EEO complaint. (See page 13 of the document.)

Exhibit G lists all of the deceptive practices carried out by the OHR in the instant case, which caused the Plaintiff to appeal its decision to the D. C. Superior Court. (Page 418 of the record.)

Exhibit H shows that the D. C. Superior Court Judge, Geoffrey M. Alprin, ignored all of the information cited in Exhibit G and issued an ORDER which is the peak of dishonesty. It is so defamatory and irresponsible that the Plaintiff has filed a complaint with the D. C. Office of Risk Management, which is investigating. Some of the false assertions which Judge Alprin presents in his ORDER as "undisputed facts" are as follows:

1. On page 3 the ORDER states that "Bagenstose was suspended based on allegations that he had sexually abused a student."

2. Also, on page 3 the ORDER states that the D. C. Public Schools claimed that a sexual abuse scandal prompted the Plaintiff's transfer to Jefferson Junior High School.

3. Likewise, on page 3 the ORDER states that the Plaintiff claimed that the School Without Walls (SWW) principal, Emily Crandall, orchestrated his transfer to retaliate against him for his outspokenness.

4. Furthermore, the ORDER states on page 3 that the Plaintiff chose to take a discontinued service retirement in lieu of being RIFed.

5. On pages 7-8 the ORDER states that oral testimony by the SWW principal, Emily Crandall, constituted substantial evidence that the SWW staff did not know about the 1995 OHR complaint.

9

    6. On page 7 the ORDER states that the OHR, after a lengthy investigation, found that the only protected act that could have prompted the Plaintiff's transfer and RIF was the filing of the 1995 complaint.

The Plaintiff's responses to Judge Alprin's assertions cited above are respectively as follows:

    1. The Plaintiff was never suspended based on allegations that he had sexually abused a student.

    2. The Plaintiff was not moved to Jefferson Junior High School on account of a sexual abuse scandal, because there was no sexual abuse scandal. Emily Crandall, not the D. C. Public Schools, told the OHR that she had the Plaintiff removed from the SWW, because a student complained about inappropriate sexual contact (hand touching) and discourse; but the OHR didn't buy it, because the transfer occurred over two years after the allegations were made. The student admitted to Mrs. Crandall in the Plaintiff's presence that he made the accusations, because the Plaintiff wouldn't sign a paper that he wanted the Plaintiff to sign. ("I am Japanese, and I will destroy you [if you don't sign my paper,"] the young man had previously said to the Plaintiff. Apparently Emily Crandall was trying to divert attention away from her discriminatory and retaliatory actions by dredging up these false accusations.

    3. The Plaintiff did not claim that he was moved to Jefferson Junior High School for being outspoken. He claimed that he was sent to Jefferson Junior High School for having filed an EEO discrimination complaint.

    4. Attachment No. 3 shows that the Plaintiff did not retire voluntarily. It also shows that the Plaintiff filed his retirement papers on July 24, 1996, which was after the effective July 19, 1996, date of termination. (See Exhibit C of the Defendant's Motion for Summary Judgment) Thus, the Plaintiff did not retire to avoid being RIFed, because he had already been terminated. He retired because the Personnel Office telephoned him and falsely told him that he had to fill out the retirement papers or the Personnel Office would do it for him, whether he wanted it done or not, possibly with adverse financial consequences. Then the Personnel Office telephoned the Plaintiff that they were changing the effective date of the termination so as to maximize the Plaintiff's benefits. That turned out to be a lie also. They changed the date so as to make it appear on paper that the Plaintiff retired before he was RIFed. The Plaintiff was told to put down the effective date as

    June 30, 1996, simply because that was the last day of
    the school year.

  5. Judge Alprin does not mention the fact that Emily
    Crandall, the only witness for the DCPS, lied when she
    said that she didn't know about the DCPS EEO complaint,
    but that the Hearing Examiner wouldn't let the Plaintiff
    impeach Emily Crandall's testimony by submitting
    documentary evidence to show that she lied. In other
    words, the Hearing Examiner suppressed evidence showing
    that Emily Crandall's testimony lacked credibility.

  6. This confusing argument falsely implies that an altogether
    new incident occurred necessitating a new complaint,
    but that was not what happened. The 1995 OHR complaint
    was that the Plaintiff was being retaliated against for
    his DCPS EEO complaint. Judge Alprin's mind-boggling
    argument simply blocks that concern from being addressed.

11. On pages 19 and 20 the Defendant's Motion for Summary Judgment lists nine so-called "undisputed facts." The Attorney General states that there is no genuine issue regarding them, but of course there is. The Plaintiff's responses to them respectively are as follows:

  1. The OHR said that there was no disparate treatment, because
    the circumstances were different. The Plaintiff's complaining
    parents went to higher authority, whereas the black teacher's
    complaining parents did not. However, Emily Crandall referred
    the Plaintiff's complaining parents to higher authority but
    not those of the black teacher as part of her disparate
    treatment. Thus, the OHR's finding was incorrect.

  2. For the 1995-1996 school year the Plaintiff was told to teach
    at Jefferson Junior High School but was not officially
    transferred.

  3. The U. S. Supreme Court has ruled that an employment-related
    action can be considered adverse and, therefore, retaliatory
    if a reasonable employee would find the action in question
    to be materially adverse to the point that it could dissuade
    a reasonable worker from making or supporting a charge of
    discrimination. (See pages 3 and 4 of this pleading) Most
    teachers would not want to move from a school in which the
    students are well behaved and functioning to a school in which
    the students are poorly behaved and far below grade level
    in the teachers' subject fields. The threat of this happening
    could very well dissuade them from making or supporting a

charge of discrimination.

4. This statement is true. The date of termination was given as July 19, 1996.

5. The Personnel Office telephoned the Plaintiff and told him that he had to submit his retirement papers, or the Personnel Office would do it for him, whether he wanted it done or not, possibly to his financial detriment. That turned out to be a lie. Then the Personnel Office telephoned the Plaintiff again and told him that they were changing the date of his termination to August 27, 1996, to maximize his benefits. That turned out to be a lie also. It was done so that it would appear in the records that the Plaintiff retired before he was terminated, which wasn't the case at all. The Plaintiff retired on July 24, 1996, after the official date of his termination, which at the time was July 19, 1996. The Personnel Office changed the date to August 27, 1996, after he had submitted his retirement papers.

   The D. C. Court of Appeals said that the Plaintiff should have asked questions; but few reasonable people would do that, if they believe that the information being given to them is from an unimpeachable source. At the time it simply did not occur to the Plaintiff that he was being lied to.

6. As previously stated on page 9 of this pleading, the administrative judge's Initial Decision at the OEA was so replete with falsehoods that the Plaintiff complained to the OEA Director, who agreed to compare the decision with the transcript of the hearing. The Director didn't fulfill his promise, however, and the OEA issued its final report, which was predicated upon a new set of falsehoods.

   Judge Weisberg didn't conclude anything. Instead, he issued an ORDER based on a preposterous accusation. He stated on page 3 of his ORDER that the Plaintiff postponed his retirement to August 27, 1996. Common sense tells us that after an employee submits his retirement papers, he can't then on his own initiative postpone the retirement date to maximize his benefits. (See Attachment No. 4, page 3)

   The D. C. Court of Appeals rendered its decision thwarting Title VII by ignoring all the precedent court decisions, which say that an employee must not be given false information when he retires and must be informed that if he retires, he cannot appeal his termination. (See pages 2 and 3 of this pleading) Also, the D. C. Court of Appeals rendered its decision with the full knowledge that a hoax had been perpetrated against the Plaintiff when he retired. (See pages 10-11 of this pleading)

12

7. What the OHR did was close the February, 1995, OHR complaint, before the case ran its full course. The Plaintiff was, therefore, forced to file another complaint in July, 1996. This tactic prevented the Plaintiff from showing the connection between the disparate treatment prompting the September, 1994, DCPS EEO complaint and his termination in 1996.

8. The OHR deliberately failed to notify Emily Crandall in 1995 that a discrimination complaint had been filed against her. Although the Plaintiff was entitled to a trial-type hearing, the OHR held a "limited" hearing so as to prevent the Plaintiff from showing that the retaliation began with the September, 1994, DCPS EEO complaint and not with the 1995 OHR complaint.

9. Judge Alprin's ORDER contains so many falsehoods and deceptive statements that the Plaintiff has trouble recognizing it as pertaining to his case. It is almost surreal. Especially hurtful and damaging are his accusations that the Plaintiff was suspended based on allegations that he had sexually abused a student and that a sexual abuse scandal prompted the Plaintiff's transfer to Jefferson Junior High School.

12. All of the incidents described above occurred after a minor incident in which a black teacher was treated differently from the Plaintiff, a white teacher. A competent administrator could have resolved this matter to everyone's satisfaction in about twenty minutes. Instead the Plaintiff was put through a process in which he was confronted every step of the way with falsehoods, deceptions, and deceitful practices. Such treatment can dissuade other employees from filing or supporting a charge of discrimination. Few people will file a complaint once they realize that a judge can enter into the public records a charge of sexual misconduct against an innocent complainant. The U. S. Supreme Court has ruled against such practices.

13. Were all the states in the United States to emulate the Government of the District of Columbia, no state government employee anywhere in the country would have Title VII protection. Thus, a horrific

threat exists against the protection of Title VII. This justifies that in the federal interest an exception be made to res judicata. (See pages 2-3 of this pleading)

The Plaintiff requests the Court to deny the Defendant's Motion for Summary Judgment. Because of the manner in which the D. C. courts treated the Plaintiff, he would like a jury of his peers to decide his case.

Respectfully submitted,

Charles M. Bagenstose
Pro se
1019 Butterworth Lane
Upper Marlboro, Maryland 20774
301-336-0622

CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2006, a copy of the foregoing Opposition to Defendant District of Columbia's Motion for Summary Judgment was hand-delivered to the following person:

Dana K. DeLorenzo
Assistant Attorney General
Office of the Attorney General
441 4th Street, N. W., 6th Floor South
Washington, D. C. 20001

Charles M. Bagenstose